**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON**

**Karen Stephens,**

        **Plaintiff,**

**v.**                                                    **Case No.  3:03-cv-343
Judge Thomas M. Rose**

**Kettering Adventist Healthcare, DBA Kettering
Medical Center Network,**

        **Defendant.**

---

**ENTRY AND ORDER GRANTING DEFENDANT'S MOTION
FOR SUMMARY JUDGMENT.**  (DOC. 15).

---

      This matter is before the Court for decision on Defendant's Motion for Summary Judgment. (Doc. 15).  The instant case stems from the termination of Plaintiff Karen Stephens from her employment with Defendant Kettering Adventist Healthcare, which does business as the Kettering Medical Center Network (Kettering).  Doc. 1.  Stephens has charged Kettering with violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626, *et seq.*, and violation of public policy in violation of Ohio law.  Doc. 1.  Kettering counters that Stephens was terminated for mistreating premature newborn infants in her care.  Kettering's motion for summary judgment asserts that Stephens can show neither that other similarly situated employees were treated differently, nor that a younger person replaced Stephens, nor that Kettering's stated reason for terminating Stephens was pretextual.  Because Stephens has produced no evidence that Kettering's stated reason for terminating Stephens was pretextual, the Court will grant Kettering's motion.

**A.     Background**

Kettering operates a number of health care facilities in the Dayton, Ohio area, including Southview Hospital and Grandview Hospital.  Prior to her termination, Stephens was employed at Southview as a staff nurse with primary responsibilities in the Special Care Nursery for the Maternal Services Department.  The Special Care Nursery is for at-risk newborns, and in this position Stephens' duties included the care and feeding of premature babies and other newborn infants requiring special care.  Gibson Depo., at 8-9.  There are two other types of nurses within the Maternal Service Department at Southview: Labor/Delivery nurses and Mother/Baby nurses.  Labor/Delivery nurses work with pregnant women who come in to deliver.  Gibson Depo. at 8.  Mother/Baby nurses work with "well babies" (i.e., babies who are born healthy, without special needs), as well as their mothers.  Gibson Depo. at 8.  Any nurse can perform Mother/Baby duties, but special training and skills are required to work as a Labor/Delivery nurse or in the Special Care Nursery.  Gibson Depo. at 10.

In early October, 2002, Janet Gibson, the night shift charge nurse for the Mother/Baby Care Unit, received two separate complaints concerning the conduct of Stephens.  Gibson Depo. at 28.  Sandy Ewald and Nicole Dibble, two registered nurses in the Maternal Services Department, told Gibson that Stephens was treating special care infants inappropriately. Ewald told Gibson that Stephens was holding infants' noses and force feeding them, and that this behavior had been going on for awhile–"months, maybe even longer," according to Gibson.  Gibson Depo. at 29-30.  Dibble told Gibson that she had witnessed similar behavior from Stephens.  Gibson Depo. at 32.

After receiving these complaints, Gibson asked other nurses working whether they had witnessed anything unusual about Stephens' care of infants in the Special Care Nursery.  Gibson

Depo. at 32-33. One nurse, Brenda Schwartz, told Gibson that she had also seen Stephens hold an infant's nose trying to get it to eat more. Gibson Depo. at 37-38. Apparently, while Stephens was holding the baby's nose to get it to eat more, the baby "went dusky" and Stephens had to blow in the baby's face to get it to breathe again. Gibson Depo. at 37-38.[1] Another nurse, Bobbie Moon, also indicated that she had observed Stephens mistreat a baby. Gibson Depo. at 41. After hearing four separate reports of inappropriate behavior toward infants under Stephens' care, Gibson reported the issue to her supervisor, Clinical Manager Jeannette Hall, who is also a registered nurse. Gibson Depo. at 36-37.

Hall contacted the Manager of Human Resources for Southview and Grandview Hospitals, Monique Kahkonen, and advised her of the reports of inappropriate treatment of infants. See Kahkonen Depo., at 11. Kahkonen and Hall, along with Pam Stout, the Interim Director of Maternal Services, began a formal investigation. Kahkonen Depo. at 14. They interviewed witnesses and requested written accounts of their observations. Gibson Depo. at 44; Kahkonen Depo. at 13-15. Kahkonen relied upon her own investigation and that of Jeannette Hall, whose notes from the initial investigation are repeated here from the record of the investigation and are indicative of the case formed against Stephens:

> October 2, 2002 @ 1300:
> Phone call to Jill Durnell:
> States she hasn't worked with Karen recently-last noticed behavior
> during summer. States she has noticed Karen being "rough" with
> babies when feeding.

---

[1] Schwartz refused to document her observations, and later recanted a portion of her story. Gibson Depo. at 38, 80-81, Exhibit 4 to Gibson Depo. However, the initial story helped form the basis for further investigation by Kettering.

-3-

October 2, 2002 @ 1315:
Phone call to Nicole Dibble, RN:
Nicole states that she witnessed Karen "pinching a baby's nose shut" during a feeding "last week", "one of the Hopson twins" (unsure if twin A or B). She also stated that Karen would feed the babies more than the prescribed amount of formula.

October 2, 2002 @ 1345:
Phone call to Sandy Ewald, RN:
States she was witnessed [sic] Karen pinching baby's nose "last Friday." States it was Baby Pyle, a preemie. States Karen was "wagging" it's nose babck [sic] and forth–yelling at the baby and calling it bad names. States the baby screamed out in pain.

States she has witnessed Karen "spanking" well babies that have come into the nursery during the night if they are fussy. States she gets angry and overly rough. States she has witnessed Karen "almost" shaking a baby because she got so mad when the baby cried and didn't eat for her. "Loses her temper."

October 2, 2002 @ 1800:
Phone call to Bobbie Moon, RN:
Had not witnessed anything recent–last time was one year ago. States she had written Karen up for rough behavior (spanking) and that the incident report was removed from Karen's file by Terri Harville, Director of SVH. Karen reported to the staff that Terri had removed the report.

October 1 [sic], 2002 AM:
Received a call from Andi Richardson, RN. States she had not personally witnessed Karen's roughness–but, had heard of it from other employees. States she g[o]t irritable, especially when she works long stretches.

October 1 [sic], 2002 AM:
Call from Joanna Adams, RN. Had not witnessed roughness, but had heard of it from other employees. States Karen gets irritable, demeaning to others in front of families/doctors.

October 3, 2002:
Phone call to Karen Stephens, RN, re: told her that I needed to discuss some serious issues with her today. She at first said she could not meet me. I told her that she would not be allowed to return to

>work until we had our discussion. States she will come today at 1330
>to the administrative offices at SVH.

Kahkonen Depo. ex. 1.

When Stephens met with her supervisor and representatives from the human resources department, she was presented with the allegations of misconduct. See Stephens Depo. at 135-138. Stephens was given an opportunity to respond to the allegations, and she first said that similar claims had previously been made but that Terri Harville, the former Director of Nursing at Southview, disregarded the claims and removed the complaint from her file (the complaint actually remains in her file but was not processed). See Kahkonen Depo. ex. 2. She also denied the conduct and named a number of nurses who she felt would give an honest opinion about the situation, including Sue Fouty, Brenda Schwartz, Andi Richardson, Sandy Ewald, Joanna Adams and Mary Deaton. Stephens Depo. at 141-143. However, Schwartz, Richardson, Ewald, and Adams were among those who had brought or corroborated the allegations made against her. Kahkonen Depo. ex. 1.

The October 3, 2002 meeting with Stephens prompted further investigation. Hall met with and interviewed nursing and management staff who had worked with Stephens. Kahkonen Depo. ex. 1. The information that was developed from the witnesses, including a number of individuals that Stephens said would provide unbiased testimony, further corroborated the allegations of misconduct and questionable care by her. The Court will here reproduce Jeannette Hall's notes from the meetings, as it is probative of the motivation for Kettering's further actions:

>October 7, 2002 @0900:
>Meeting with Nicole Dibble, RN at SVH with Pam Stout, RN, Director, and Jeanette Hall, RN, CNM:
>Nicole was asked to demonstrate how Karen "pinched" a baby's nose during feeding. She states that both nares were occluded to make the baby gasp and swallow. She states that this is not a practice that she has ever seen done by another nurse. States Karen was "angry" when

she did this. Says that Karen does this out of frustration. States her attitude has increasingly worsened the past 2-3 weeks. Describes her affect as "nasty." States that Karen often leaves the unit to rent movies. Closes the nursery blinds so no one can see what she is doing. Will bring in a smorgasbord of food and choose who she will allow to eat the food. Is not a team player–will not help MB [Mother/Baby] nurses.

When asked why she is just now coming forward she states that she is the "new kid on the block" didn't want to get her in trouble.

October 7, 2002 @0945:
Phone call to Sandy Ewald, RN from Pam Stout and Jeanette Hall: States Karen gets rough with the babies when she is tired–works four days in a row. States she has witnessed her cursing at babies and spanking them hard through their blankets. We asked her "if a parent saw that behavior would they have a right to be concerned?" Sandy stated "yes". Was aware that a situation had occurred in the past but that the report was removed by Terri Harville. Sandy states "Karen doesn't know where the line is." She gets tired–works too many days in a row. She does the rough behavior out of frustration.

When asked why now. She states she was asked by the charge nurse after hearing what had happened.

October 8, 2002 @ 19:30:
Meeting with Brenda Swartz, RN at SVH, Monique Kahkonen, HR, and Jeanette Hall, RN, CNM:
Brenda states that she has seen Karen blowing into the face of infants, and vigorously feeding, but not spanking, pinching nose. She states that she and Karen work well together in the nursery.

October 8, 2002 @ 1945:
Meeting with Jill Durnell, RN, Monique Kahkonen, and Jeanette Hall, RN, CNM:
Jill states that Karen feeds babies more vigorously than she would consider feeding. She has not witnessed any of the other accused behaviors, but, Karen does swear a lot in the nursery–when she gets upset.

October 8, 2002 @ 2015:
Meeting with Pam Long, RN, Monique Kahkonen, HR, and Jeanette Hall, RN, CNM:

> Pam now works MB [Mother/Baby] but has a history back many years with Karen. She states that she witnessed Karen shaking a baby out of being angry when they worked together at GVH. She states that Karen does not get along well with some of the mother/baby nurses–"not a team player". States sits in the nursery much of the time playing on the computer and watching TV.
>
> October 8, 2002 @ 2030:
> Meeting with charge nurses Janet Gibson and Jackie Lovelace:
> Both expressed great concern as to how Karen's behavior impacted the unit. They state that the staff was reluctant to report Karen due to the fact that she had been good friends with the past Director, Terri Harville, and had been "protected". Karen had the staff believing that she could do whatever she liked and have no consequences. Both nurses have attached statements.
>
> Appointment was made with Karen for meeting Wednesday October 9th at 1700 in the HR department of GVH.
>
> October 9, 2002 @ 1215:
> Phone call to Andi Richardson, RN from Monique Kahkonen, HR and Jeanette Hall, RN, CNM:
> Andi states that she does not want to see Karen get into trouble. She has witnessed Karen getting irritable in the past when working multiple days in a row. Karen's behavior has always been tolerated because she always had Terri Harville backing her up–no one could touch her. Karen has bragged that she has dirt on everyone including the doctors. She doesn't feel Karen would intentionally harm a baby.

Kahkonen Depo. ex. 1.

At the follow-up meeting on October 9, 2002, Kahkonen, Hall and Stout informed Stephens that, based on the complaints that were made against her, Kettering had decided to terminate her employment. Stephens was given the option of resigning, to which she responded that she would be seeking legal advice. *Id.*, and Stephens Depo. at 151-155. Stephen's dismissal resulted in a younger part-time employee being promoted to a full-time position in the special care nursery. Dibble Depo. 34-36.

Stephens filed a complaint with the EEOC on February 29, 2002. Doc. 1 ex. A. On August 18, 2003, the EEOC issued a right-to-sue letter. On October 6, 2003, Stephens filed an action in United States District Court for the Southern District of Ohio alleging discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626, *et seq.*, and violation of public policy in violation of Ohio law. Doc. 1. When discovery was complete, Kettering filed a motion for summary judgment pursuant to Federal Rule of Civil Procedure 56, doc. 15, which Stephens has opposed. doc. 21.

**B.    Standard of Review**

The standard of review applicable to motions for summary judgment is established by Federal Rule of Civil Procedure 56 and associated case law. Rule 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Alternatively, summary judgment is denied "[i]f there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Hancock v. Dodson*, 958 F.2d 1367, 1374 (6th Cir. 1992) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S. Ct. 2505 (1986)). Thus, summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S. Ct. 2548 (1986).

The party seeking summary judgment has the initial burden of informing the court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to

interrogatories, admissions and affidavits which it believes demonstrate the absence of a genuine issue of material fact. *Id.*, at 323. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S., at 250, 106 S. Ct. 2505 (quoting Fed. R. Civ. P. 56(e)).

Once the burden of production has shifted, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is not sufficient to "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 106 S. Ct. 1348 (1986). Rule 56 "requires the nonmoving party to go beyond the pleadings" and present some type of evidentiary material in support of its position. *Celotex Corp.*, 477 U.S., at 324, 106 S. Ct. 2548.

In determining whether a genuine issue of material fact exists, a court must assume as true the evidence of the nonmoving party and draw all reasonable inferences in the favor of that party. *Anderson*, 477 U.S., at 255, 106 S. Ct. 2505. If the parties present conflicting evidence, a court may not decide which evidence to believe by determining which parties' affiants are more credible. 10A Wright & Miller, *Federal Practice and Procedure*, § 2726. Rather, credibility determinations must be left to the fact-finder. *Id.*

Finally, in ruling on a motion for summary judgment, "[a] district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*, 889 F.2d 108, 111 (6th Cir. 1989). Thus, in determining whether a genuine issue of material fact exists on a particular issue, the court is entitled to rely upon the Rule 56 evidence specifically called to its attention by the parties.

In addition to moving for summary judgment on Stephen's federal claim, Kettering is seeking summary judgment on Stephen's claim brought under Ohio law. In reviewing an Ohio claim, this Court must apply the law of Ohio, as interpreted by the Supreme Court of Ohio. *Northland Ins. Co. v. Guardsman Prods. Inc.*, 141 F.3d 612, 617 (6th Cir. 1998). Specifically, this Court must apply the substantive law of Ohio "'in accordance with the then-controlling decision of the highest court of the State.'" *Imperial Hotels Corp. v. Dore*, 257 F.3d 615, 620 (6th Cir. 2001) (quoting *Pedigo v. UNUM Life Ins. Co.*, 145 F.3d 804, 808 (6th Cir. 1998). Also, to the extent that the highest court in Ohio has not addressed the issue presented, this Court must anticipate how Ohio's highest court would rule. *Id.* (quoting *Bailey Farms, Inc. v. NOR-AM Chem. Co.*, 27 F.3d 188, 191 (6th Cir. 1994).

**C.     Analysis**

Stephens's complaint asserts that Kettering committed age discrimination in violation of the Age Discrimination in Employment Act, 29 U.S.C. § 626, *et seq.*, and Ohio public policy. Kettering's motion for summary judgment asserts that Stephens can show neither that other similarly situated employees were treated differently, nor that a younger person replaced Stephens, nor that Kettering's stated reason for terminating Stephens was pretextual. Because Stephens has no evidence that Kettering's stated reason for terminating Stephens was pretextual, the Court will grant Kettering's motion.

A plaintiff may survive a defendant's motion for summary judgment on a claim of age discrimination either by presenting direct or indirect evidence of discrimination. Direct evidence is where an employer's statement directly shows discriminatory motive. See *Schlett v. Avco Fin. Servs., Inc.*, 950 F. Supp. 823, 828 (N.D. Ohio 1996). The Sixth Circuit stated in *Manzer v.*

*Diamond Shamrock Chemicals Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994), that evidence that would require the jury to infer a fact is not direct evidence.  Direct evidence, in the form of verbal comments, will be similar to an employer telling its employee, "I fired you because you are [old]." *Smith v. Chrysler Corp.,* 155 F.3d 799, 805 (6th Cir. 1998).  In analyzing discriminatory comments, factors to consider include whether a decision maker or an agent made the comment, whether the comment was related to the decision-making process, and whether the comment and the discriminatory act were close in time.  See *Cooley v. Carmike Cinemas, Inc.*, 25 F.3d 1325, 1330 (6th Cir. 1994).

In the instant case, Stephens has no direct evidence of age discrimination, but claims to have fulfilled the *McDonnell-Douglas* requirements for establishing a claim of discrimination by indirect evidence.  In order to prove a *prima facie* case of employment discrimination by indirect evidence, a plaintiff must show that: (1) she was a member of the protected class; (2) she suffered an adverse employment action; (3) she was qualified for the position from which she was terminated; and (4) she was either replaced by a person from outside the protected class or was treated differently than a similarly situated employee from outside the protected class.  *Hein v. All Am. Plywood Co.*, 232 F.3d 482, 489 (6th Cir. 2000); see also *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817 (1973); *Warfield v. Lebanon Correctional Inst.*, 181 F.3d 723, 728 (6th Cir. 1999); *Kirkland v. St. Elizabeth Hosp.*, 120 F. Supp. 2d 660, 665-66 (N.D. Ohio 2000); and *O'Hara v. Mt. Vernon Bd. of Educ.*, 16 F. Supp. 2d 868, 886 n.16 (S.D. Ohio 1998).  In order to prove the alternative basis of the fourth element, being treated differently that similarly situated employees outside the protected class, a plaintiff must produce evidence that the "relevant other employees are 'similarly situated in all respects.'"  See *Hollins v. Atlantic Co.*, 188 F.3d 652, 659 ((6th Cir. 1999)

(quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). The plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar, that is, "nearly identical," in "all of the relevant aspects." *Noble v. Brinker Intern., Inc.*, 391 F.3d 715, 729 (6th Cir. 2004). The individuals with whom the plaintiff seeks to compare his or her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Id*.

In age discrimination cases, the protected class includes all workers at least 40 years old and the fourth element is modified to require replacement not by a person outside the protected class, but merely replacement by a significantly younger person. *Kline v. Tennessee Valley Authority*, 128 F.3d 337, 352-53 (6th Cir. 1997); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311-13, 116 S. Ct. 1307 (1996).

Once the plaintiff establishes the *prima facie* case, the employer takes on the burden of producing a legitimate, nondiscriminatory reason for the plaintiff's discharge or denial of promotion. See *Texas Department of Comm. Affs. v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089 (1981); *McDonnell Douglas*, 411 U.S., at 802, 93 S. Ct. 1817. Once the employer does so, the burden shifts back to the plaintiff to show by a preponderance of the evidence that the employer's stated legitimate reasons are merely pretexts for discrimination. See *McDonnell Douglas*, 411 U.S., at 802, 93 S. Ct. 1817. The plaintiff may establish pretext by showing that the employer's proffered explanation is false or unworthy of credence. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 120 S. Ct. 2097, 2105-2106 (2000).

Kettering asserts as a legitimate, non-discriminatory reason for Stephens' discharge the misconduct toward infants under Stephens' care. This conduct includes allegations that Stephens repeatedly pinched the noses of premature newborn infants, wagged their noses until they screamed in pain, held their jaws hard to facilitate feedings, spanked their bottoms when they got fussy or cried, and lost her temper and shook one for crying. Kettering's knowledge of these acts was developed through a multi-step investigation that garnered statements from numerous witnesses involving various babies over a span of months. The burden of production thus shifts back to Stephens to show by a preponderance of the evidence that Kettering's facially legitimate reason is merely a pretext for discrimination. See *McDonnell Douglas*, 411 U.S., at 802, 93 S. Ct. 1817.

Rather than produce evidence on this point, Stephens asserts simply that:

> There is no independent evidence to corroborate any individual allegations which constitute the collective conspiracy of Plaintiff's younger co-workers and managers. Surely a jury can consider the perfunctory nature of the investigation and the lack of any effort to obtain corroborative inquiry to conclude that the so-called allegations were merely a pretext to cause "grann[y's]" premature departure. The jury can certainly consider the fact that the health and welfare of the babies was never a concern.

Doc. 21 at 8. While Stephens repeatedly puts the word "granny" in quotation marks in her opposition memorandum, at no point does she assert, much less point the Court to evidence supporting the claim, that any co-worker or supervisor used this word in reference to Stephens. Similarly, there is no evidence that all of those making allegations against Stephens were younger than Stephens. Neither does Stephens bring to the Court's attention any other evidence of a conspiracy. "A district court is not…obligated to wade through and search the entire record for some specific facts that might support the nonmoving party's claim." *InterRoyal Corp. v. Sponseller*,

889 F.2d 108, 111 (6th Cir. 1989).  Stephens has failed to produce any evidence that Kettering's facially legitimate reason for terminating her is merely a pretext for discrimination.  Summary judgment will therefore be entered for Kettering on the ADEA claim, leaving unresolved the state law claim.

It is not clear whether Ohio allows an action for age discrimination in violation of public policy.  *Gessner v. Union*, 823 N.E.2d 1, 5 (Ohio App. 2004).  Assuming it exists, it seems logical that there must be some evidence of discrimination.  *DePrisco v. Delta Air Lines, Inc.*, 90 Fed. Appx. 790, 796 (6th Cir. 2004).  Stephens having failed to produce any evidence of discrimination, judgment will be entered against her on the state law claim as well.

**D.**     **Conclusion**

Because Stephens has produced no evidence that Kettering's stated reason for terminating Stephens was pretextual, the Court need not consider the contention that no similarly situated employees were treated differently, or that Stephens was not replaced by younger employees, prior to entering summary judgment for Kettering on the ADEA claim.  The lack of evidence of discrimination also allows entry of summary judgment on the state law claim.  Wherefore, the Court hereby **GRANTS** Defendant's Motion for Summary Judgment.  (Doc. 15).  The Clerk is **ORDERED** to enter judgment for Defendant on all claims.  The captioned cause is hereby **TERMINATED** upon the docket records of the United States District Court for the Southern District of Ohio, Western Division, at Dayton.

**DONE** and **ORDERED** in Dayton, Ohio, Wednesday, April 27, 2005.

                                                                    s/Thomas M. Rose

                                                            _____
                                                                    THOMAS M. ROSE
                                                            UNITED STATES DISTRICT JUDGE